TAULBEE, APPELLEE, *v.* THE TRAVELERS COMPANIES, APPELLANT.

(No. 1639—Decided
December 7, 1987.)

*Porter, Wright, Morris & Arthur* and *William M. Todd,* for appellant.[1]

STEPHENSON, J. This is an appeal from a judgment entered after a bench trial by the Portsmouth Municipal Court in favor of Edith Taulbee, plaintiff below and appellee herein, awarding the sum of $8,480 plus court costs against The Travelers Companies, defendant below and appellant herein, upon a group insurance policy between appellant and C. A. Lancaster Enterprises, appellee's employer. Appellant assigns the following errors which are interrelated and will be jointly considered:

"1. The trial court erred in disregarding the contractual limitations on benefits provided and the exclusions.

"2. The judgment is not sus-

[1] On appeal no appearance was made by Edith Taulbee, plaintiff below and appellee herein, through her counsel, John Thatcher, by way of appellate brief or otherwise.

tained by the evidence and is contrary to law."

The record reflects the following facts pertinent to this appeal. Appellee's husband, Jerry Taulbee, was diagnosed as suffering from a nodular-type lymphoma, a malignancy, through a biopsy performed on January 24, 1984. Mr. Taulbee was subsequently referred to the University of Chicago Hospital where oral chemotherapy was instituted. Mr. Taulbee returned to Chicago for treatment on a routine basis, but discontinued treatment when a tumor was discovered under his right arm in February 1985, and surgical excision was recommended.

In March 1985 Mr. Taulbee went to the Immuno-Augmentative Therapy Bahamas Ltd. clinic in the Bahamas to receive a treatment known as immuno-augmentative therapy for his malignancy. Immunoaugmentative therapy, an unproved cancer therapy not approved for use in the United States and apparently offered only at Immuno-Augmentative Therapy Bahamas Ltd., is based on the theory developed by Dr. Lawrence Burton, Ph.D., that the defective immune system of a patient with cancer can be supplemented through intramuscular injections of several types of specific immune serum protein fractions. Throughout the treatment program, Mr. Taulbee consulted G. B. McPhee, M.D. at the clinic and was thereafter seen by Dr. McPhee on a weekly basis. Mr. Taulbee received immuno-competence blood tests to determine the amount and type of immune serum protein necessary for treatment, and received injections of blood plasma elements administered by either Dr. McPhee, a nurse, or Mr. Taulbee himself. During the foregoing treatment, which lasted from March 4, 1985 to May 31, 1985, Mrs. Taulbee observed a marked improvement in her husband's physical condition. Appellee's evidence tended to establish that the Taulbees considered Dr. McPhee as the attending physician.

Appellee was a certificate holder under a group health insurance policy issued to her employer by appellant. The effective date for coverage was April 15, 1984, and appellee's husband was also included in the coverage as a dependent. Of all the claims submitted by appellee to appellant, the only ones not reimbursed were the claims made for treatment received through Dr. McPhee. The billings to appellant were on the letterhead "iat ltd.," specified the treatment received, including doctors consulted, and the billings were certified by Dr. McPhee upon the claim form. Additionally, Dr. McPhee designated himself as "Physician or Supplier." In a letter dated August 12, 1985, appellant denied the claim on the basis that "[t]he charges submitted are not those of a hospital, nor are they charged by a physician. They are the charges of I.A.T., Ltd., and as such do not qualify for benefits available to such providers." The insurer also claimed the services did not fall within the other categories of coverage under this policy. Appellee's second claim for services rendered at Immuno-Augmentative Therapy Bahamas Ltd. was likewise rejected by appellant. Appellee, having paid the two claims in question, filed suit to recover under the insurance contract.

The insurance contract provided, in pertinent part, the following:

"COVERED MEDICAL EXPENSES

"Covered medical expenses are reasonable charges (see Definitions) actually incurred for the services and supplies listed below upon the recommendation and approval of the attending physician and required for treatment for you or your Dependent, provided such services and supplies are medically necessary.

"1. HOSPITAL SERVICES FOR

"a. Room and Board but not including charges for private room accommodations which exceed the hospital's regular daily semi-private rate.

"b. Other Hospital Services and Supplies.

"2. PHYSICIAN'S OR SURGEON'S SERVICES for a surgical procedure and other medical care and treatment.

"* * *

"5. X-ray and Laboratory Examinations made for diagnostic or treatment purposes.

"6. Radiation Therapy by X-ray, radon, radium and radioactive isotopes.

"7. Anesthetics and their administration.

"8. Chemotherapy.

"9. Medical Supplies

"a. Prescription drugs and medicines.

"* * *"

Appellant argues that the trial court erred in disregarding the contractual limitations on benefit coverage and policy exclusions in several respects. Appellant argues that immunoaugmentative therapy is not a covered expense because (1) it is not one of the services or supplies specified and enumerated in the policy; (2) it was not recommended or approved by the attending physician of the insured; (3) it was not medically necessary; (4) it was not required for treatment; and (5) the treatment costs were not reasonable charges. Appellant also asserts that the therapy was excluded in part because the lymphoma represented a pre-existing condition under the policy provisions, which argument will be subsequently considered.

A primary argument by appellant is that the immunoaugmentative therapy is not a covered medical expense because the treatment did not involve "services" or "supplies" within the meaning of those terms of the insurance contract. The statement of professional services on I.A.T., Ltd. stationery and signed by G. B. McPhee, M.D. reflected three types of charges: evaluations and consultations with the medical doctor, laboratory analysis including immuno-competence blood tests, and blood plasma elements administered by injection. The Travelers Group Health Claim forms submitted by appellee and signed by G. B. McPhee, M.D. as the attending physician were for immuno-competence blood tests, injections, and blood plasma elements.

In Ohio, words in an insurance contract which are not defined therein are read according to their ordinary meaning unless there is an ambiguity. *Gomolka* v. *State Auto. Mut. Ins. Co.* (1982), 70 Ohio St. 2d 166, 24 O.O. 3d 274, 436 N.E. 2d 1347; *Olmstead* v. *Lumbermens Mut. Ins. Co.* (1970), 22 Ohio St. 2d 212, 51 O.O. 2d 285, 259 N.E. 2d 123. Where a contract is prepared by the insurer and includes language which is doubtful, vague, or ambiguous, it is axiomatic that the language is to be construed in favor of the insured and strictly against the insurer. *Suburban Community Hospital* v. *Linquist* (1982), 69 Ohio St. 2d 302, 23 O.O. 3d 286, 432 N.E. 2d 173; *Toms* v. *Hartford Fire Ins. Co.* (1945), 146 Ohio St. 39, 31 O.O. 538, 63 N.E. 2d 909; *Munchik* v. *Fid. & Cas. Co.* (1965), 2 Ohio St. 2d 303, 31 O.O. 2d 569, 209 N.E. 2d 167. In the case *sub judice,* the general term "services and supplies" included by enumeration "physician's services," "medical care and treatment," "laboratory examination," "chemotherapy," and "prescription drugs and medicines," which are terms not defined within the policy.

Given our conclusion hereinafter set forth that under the evidence minds could fairly conclude the treatment was required treatment and

medically necessary, we conclude that reasonable minds could find that the charges for physician's services for medical care and treatment are within the coverage provision of the insurance contract. Testimony presented by Dr. Kunderman and appellee established that Dr. McPhee was a medical doctor and that he treated appellee's husband. The insurance contract also provided coverage for laboratory examinations made for diagnostic or treatment purposes. Again, testimony by Dr. Kunderman tended to establish that the computerized immunocompetence blood tests were utilized during the immunoaugmentative regimen to regulate the course of treatment, i.e., treatment purposes.

The contract in question also covers chemotherapy and medical supplies, which include prescription drugs and medicines. Chemotherapy is "the prevention or treatment of esp. infectious disease in man, animals, or plants by the use of chemical agents." Webster's Third New International Dictionary (1966) 384. Using the plain and ordinary meaning of chemotherapy, a term undefined by the insurer, reasonable minds could further find that the blood plasma elements used to counteract the malignancy could be fairly considered either chemotherapy or a medical supply under the contract. For the foregoing reasons, we find that all of the services rendered at the I.A.T., Ltd. facility were "services" or "supplies" within the meaning of the contractual terms.

Appellant further argues that immunoaugmentative therapy was not required for treatment, not medically necessary, and not a reasonable charge. Appellant cites *Lockshin* v. *Blue Cross of Northeast Ohio* (1980), 70 Ohio App. 2d 70, 24 O.O. 3d 80, 434 N.E. 2d 754, for the proposition that medically "necessary" is an unambiguous term that imports something

that is "indispensable, essential or required." *Lockshin,* however, is factually distinguishable and inapposite. In *Lockshin* a healthy female patient about to undergo an uneventful Cesarean section requested her doctor to order the services of a private nurse *one week before* the patient had the surgery. In the case below, appellee's husband was faced with a grave medical condition, a malignant lymphoma, requiring extraordinary treatment. There was also evidence that the chemotherapy instituted by the University of Chicago Hospital was not working, e.g., the subsequent tumor formation. Manifestly, treatment of appellee's husband was medically necessary.

Appellant also asserts that the immunoaugmentative therapy was not required for treatment. There is authority for appellant's proposition that an insured's unfettered right to select a physician and follow his advice does not create a corresponding responsibility in the insured to pay for every treatment so chosen. See *Free* v. *Travelers Ins. Co.* (D. Md. 1982), 551 F. Supp. 554. However, *Free* is distinguishable from the case at bar. In *Free* there was overwhelming evidence as to the inefficacy of the laetrile therapy, but more importantly the court found that "[p]laintiff introduced no credible evidence establishing the efficacy of laetrile." *Id.* at 560.

Dr. Philip J. Kunderman, M.D., who testified on behalf of appellee, stated that he was familiar with the I.A.T., Ltd. facility and the therapy, and testified, in substance, that the treatment consisted of computerized laboratory tests of the patient's immune status and injections administered by either the physician or patient. Finally, appellee testified that the statements of professional services from the facility represented an accurate rendition of the therapy pro-

vided to her husband. Specifically, Dr. Kunderman testified as follows:

"Q. And obviously I presume Doctor that there are other people for whatever reason that don't think that is the proper treatment?

"A. Yes, the National Cancer Institute has classified this theraphy [sic] as non-approved, I think, or non-effective something of that category.

"Q. Based upon your experience as an individual, as a patient and your long-standing treatment of cancer as a medical doctor it is your opinion that it is an effective treatment?

"A. I would say it is very effective. And, Sir, I would amend that by saying it's not 100% effective but certainly no therapy is and to get the improvement that we see in these far advanced patients that he has demonstrated that is possible one can't help but feel that he's doing something that is very creditable and worthwhile.

"* * *

"Q. And, Sir, I believe sir in your studies down there and treatment down there you are acquainted with Dr. McPhee who was the doctor for Mrs. Taulbee's husband?

"A. Yes, I was.

"Q. And, is he a medical doctor?

"A. Yes, he is.

"Q. And are you aware that he was one of the doctors organized together at this clinic?

"A. Yes, I was.

"Q. Sir, are you aware from discussing with me and the evidence that I have given you that Mrs. Taulbee's husband does have a form of cancer or lymphoma?

"A. Yes, from what I have read and from the information that she presented to me, I think that is correct.

"Q. And, Sir, as a medical doctor would you have considered this as Dr. McPhee has submitted in writing to the Company would you have con-sidered this a reasonable medical treatment for this type of condition?

"A. I would."

Dr. Kunderman further testified the fees charged appellee were standard fees for the treatment involved, inferentially establishing the reasonableness of the fees which were not contradicted by appellant's evidence.

In sum, appellee introduced competent evidence, apparently credited by the trial court, that immunoaugmentative therapy was effective. Upon this issue appellant presented no expert testimony, but relied upon a report appearing in the Journal of the American Medical Association, the tenor of which was that the disputed therapy had not been proven effective and was dangerous because of the attendant risks of infection. The writers are Gregory A. Curt, M.D., Gale Katterhagen, M.D., and Francis X. Mahaney, Jr., whose qualifications and expertise are not set forth.

While the court apparently admitted the article under the "learned treatise" exception to the hearsay rule, see 5 Wigmore on Evidence (Chadbourn Rev. 1974) 3, Section 1362, and 6 Wigmore on Evidence (Chadbourn Rev. 1976) 2, Section 1690, the weight to be given to such exhibit was solely the prerogative of the trial court, the court, by its judgment, necessarily finding the weight was insufficient to overcome the direct live testimony of Dr. Kunderman. We further note that unlike *Free* v. *Travelers Ins. Co.,* *supra,* wherein the insurer presented competent credible expert testimony in avoiding coverage for laetrile therapy, such persuasive evidence was not presented herein.

Finally, appellant argues that part of the claim by appellee should be disallowed because the lymphoma represented a "pre-existing condition" as defined in the policy. The policy per-

taining to preexisting conditions provided:

"A pre-existing condition is any injury or sickness for which medical care and treatment is received by you or your Dependent during the 3 month period ending on the date of coverage. In the event of a pre-existing condition, coverage for that condition will be limited to a maximum payment of $5,000 until 3 consecutive months have elapsed during which no care or treatment for that condition has been received. However, even if treatment is continuous, benefits will be payable with respect to that condition on the same basis as any other injury or sickness after your insurance has been in force during active employment for 6 months. *Your Dependent will be so covered after his insurance has been in force 12 months.*" (Emphasis added.)

Appellant argues that the immunoaugumentative therapy was not received by the insured within the effective date of the policy. Appellant concedes that the effective date for insurance coverage of appellee is April 15, 1984, but contends that the pre-existing condition provision creates an effective coverage date for treatment of appellee's husband of April 15, 1985 due to the pre-existing illness. We disagree. The term "effective date" is not defined anywhere within the policy. Additionally, "The Travelers Insurance Company Request For Group Insurance" form was endorsed by appellant with an effective date of April 15, 1984.

Appellant urges we construe the provision in question to mean no coverage is extended to a dependent until the policy has been in force for twelve months. To so construe the provision would require that we ignore that language in the preceding sentence providing that "However, even if

treatment is continuous, benefits will be payable with respect to that condition on the same basis as any other injury or sickness after your insurance has been in force during active employment for 6 months." This sentence is followed by the provision, "Your dependent will be *so covered* after his insurance has been in force 12 months." (Emphasis added.) In our view, this means there will be limited coverage, *i.e.*, up to $5,000 for pre-existing conditions after the effective date of the policy and unlimited coverage after twelve months from the effective date.

While we conclude the provision is clear in meaning, even if it is considered ambiguous, the provision must be construed against the insurer who drafted the contract language. *Suburban Community Hospital* v. *Linquist, supra.*

Accordingly, the expenses for the immunoaugmentative therapy which were within the limitation period, April 15, 1984 to April 15, 1985, were less than $5,000, so were totally covered. The remainder of the appellee's expenses are covered as outside the limitation period. Additionally, the record reflects that appellant and appellee agreed at trial that Travelers would be responsible for the first $5,000 for appellee's dependent during the initial period and would be responsible for the balance after the limitation period if the treatment were determined by the court to be a covered medical expense.

Counsel for the parties and the claims manager, Joseph Plaza, agreed that the pre-existing condition provision was not, therefore, in issue, at least to the extent of the first $5,000. By so agreeing, appellant waived this issue since it was removed from adjudication by the court below. An ap-

pellate court will not address an issue which was not presented or decided by the lower court. *American Vineyards Co.* v. *Wine Group* (1984), 20 Ohio App. 3d 336, 20 OBR 471, 486 N.E. 2d 854; *Sakian* v. *Taylor* (1984), 18 Ohio App. 3d 62, 18 OBR 175, 480 N.E. 2d 822; *Van Camp* v. *Riley* (1984), 16 Ohio App. 3d 457, 16 OBR 539, 476 N.E. 2d 1078. This is manifestly the situation in the case below where the parties agreed that "* * * the exclusion originally claimed for [the] pre-existing condition is not presently before the Court. * * *"

We find no merit in appellant's argument that the evidence is insufficient to support the judgment. Appellee produced evidence that was competent and credible to establish that the immunoaugmentative therapy was a covered provision under the insurance policy, to wit: the treatment was among the enumerated supplies and services, was required, was medically necessary, was a reasonable charge, and was recommended by a medical doctor. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as against the manifest weight of the evidence. *Seely* v. *Rahe* (1985), 16 Ohio St. 3d 25, 16 OBR 374, 475 N.E. 2d 1271; *Sambunjak* v. *Bd. of Review* (1984), 14 Ohio App. 3d 432, 14 OBR 550, 471 N.E. 2d 835; *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578.

For the reasons above set forth, both assignments of error are overruled and the judgment is affirmed.

*Judgment affirmed.*

GREY, P.J., and ABELE, J., concur.